IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

LADONNA DEBOE o/b/o DDD-R,          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Case No. 16-0195-CV-W-REL-SSA
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is a proceeding under Title XVI of the Social Security Act (the Act), 42

U.S.C. §§ 1381, et seq. Section 1631(c)(3)of the Act, 42 U.S.C. §1383(c)(3), provides

that "[t]he final determination of the Commissioner . . . shall be subject to judicial review

as provided in section 205(g) [42 U.S.C. § 405(g)] to the same extent as the

Commissioner's final determination under section 205."

Plaintiff argues that the administrative law judge erred by (1) failing to find that

plaintiff's impairments met or medically equaled Listing 112.11 and (2) inappropriately

weighing the evidence by (a) failing to give controlling weight to Latha Venkatesh, M.D.;

(b) failing to mention the opinion of Tamera Bryant, plaintiff's kindergarten teacher; and

(c) giving controlling weight to the opinion of Dr. Isenberg who did not treat plaintiff.

I find that there is substantial evidence in the record to support the ALJ's decision.

Therefore, plaintiff's motion for summary judgment will be denied and the decision of

the Commissioner will be affirmed.

## I. BACKGROUND

On July 24, 2013, plaintiff's mother, acting on plaintiff's behalf, protectively filed an application for child's supplemental security income ("SSI") benefits based on disability under Title XVI, alleging disability beginning June 1, 2013, due to attention deficit hyperactivity disorder ("ADHD"). The application was denied initially on September 30, 2013. On November 19, 2014, Administrative Law Judge George Bock held a hearing. The ALJ found on December 23, 2014, that plaintiff is not disabled. On January 16, 2016, the Appeals Council denied plaintiff's request for review. Therefore, the opinion of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008). Evidence that both supports and detracts from the Commissioner's decision should be considered, and an administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. Finch v. Astrue, 547 F.3d at 935 (citing Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). A court should disturb the ALJ's decision only if it falls outside the available "zone of choice," and a decision is not outside that zone of choice simply because the court may have reached a different conclusion had the court been the fact finder in the first instance. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir.

2

2006) (citations omitted).  The Eighth Circuit has further noted that a court should "defer heavily to the findings and conclusions of the SSA." <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001).

An individual under the age of 18 will be considered disabled if he has a medically determinable physical or mental impairment that results in marked and severe functional limitations, and that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Notwithstanding, no individual under the age of 18 who engages in substantial gainful activity may be considered to be disabled.  The Social Security Administration has established a three-step sequential evaluation process to determine whether an individual under the age of 18 is disabled.  20 C.F.R. § 416.924(a).

1.      Is the claimant engaging in substantial gainful activity?

> Yes = Not disabled.
> No  = Go to next step.

2.      Does the claimant have a medically determinable impairment or combination of impairments that is severe?

> No  = Not disabled.
> Yes = Go to next step.

3.      Does the claimant have an impairment or combination of impairments that meets or medically equals the criteria of a listing or that functionally equals the listings and has or is expected to last at least 12 months?

> Yes = Disabled.
> No  = Not disabled.

Whether an impairment or combination of impairments functionally equals the listings depends on how appropriately, effectively, and independently the claimant performs activities in six domains -- (1) acquiring and using information, (2) attending

3

and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for himself, and (6) health and physical well-being -- as compared to other children of the same age who do not have impairments. To functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(d).

A child has an "extreme" limitation in a domain when his impairment interferes "very seriously" with his ability to initiate, sustain, or complete activities independently. 20 C.F.R. § 416.926a(e)(3). A child's day-to-day functioning may be "very seriously" limited when his impairment limits only one activity or when the interactive and cumulative affects of his impairment limit several activities. An "extreme limitation" also means:

1.     A limitation that is "more than marked."

2.     The equivalent of functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean.

3.     A valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and his day-to-day functioning in domain-related activities is consistent with that score.

4.     For the domain of health and physical well-being, episodes of illness or exacerbations that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation.

A child has a "marked" limitation in a domain when his impairment "interferes seriously" with the ability to initiate, sustain, or complete activities independently. 20 C.F.R. § 416.926a(e)(2). A child's day-to-day functioning may be "seriously limited"

4

when the impairment limits only one activity or when the interactive and cumulative

affects of the impairment limit several activities.  A "marked" limitation also means:

1.     A limitation that is "more than moderate" but "less than extreme."

2.     The equivalent of functioning that would be expected on standardized
testing with scores that are at least two, but less than three, standard deviations below
the mean.

3.     A valid score that is two standard deviations or more below the mean, but
less than three standard deviations, on a comprehensive standardized test designed to
measure ability or functioning in that domain, and his day-to-day functioning in domain-
related activities is consistent with that score.

4.     For the domain of health and physical well-being, frequent episodes of
illnesses because of the impairment or frequent exacerbations of the impairment that
result in significant, documented symptoms or signs that occur (1) on an average of
three times a year or once every four months, each lasting two weeks or more, (2) more
often than three times a year or once every four months but lasting longer than two
weeks, if the overall affect (based on the length of the episode or its frequency) is
equivalent in severity.

## III.     THE RECORD

The record consists of the testimony of plaintiff's mother in addition to

documentary evidence admitted at the hearing.

### A.     SUMMARY OF RECORDS

#### 1.     Administrative Records

##### a.     Child Supplemental Questionnaire

On September 11, 2013, plaintiff's mother, Ms. Deboe, completed this form and

reported that plaintiff is able to play video games and puzzles or use a computer for ten

minutes at a time (Tr. at 143-145).  If plaintiff goes out shopping, to eat, or to special

events with his mother, he has to go right after his early morning medicine.  She has to

talk him through the whole outing to make sure he does not get out of hand.  Plaintiff

does not listen when he is told to do something, he throws temper tantrums, he will not sit still, he talks back, and he fights. Plaintiff has not visited the school nurse because of his impairment. His school has not recommended that he participate in summer school.

### b. Letter from plaintiff's sister

In a letter dated only "11/14" plaintiff's sister, Tanisha Deboe, wrote that plaintiff is very hyper, it is hard to keep him calm, she gets very frustrated with him at times due to his inability to sit still, and he has a temper -- if he does not get his way, he screams as loud as he can, kicks, and has outbursts (Tr. at 198). The age of plaintiff's sister Tanisha is unknown.

### 2. School Records.

Plaintiff's elementary school cumulative record shows that from 2011 through 2012 (age 3 through 4), his class work evaluation in every subject was 2 out of 5 with 5 being the highest (Tr. at 160). He was promoted to "P4." During the academic year 2012 through 2013 (age 4 through 5), his class work in every subject was 3 out of 5 with 5 being the highest. He was promoted to kindergarten.

On May 29, 2013 (prior to plaintiff's alleged onset date), when plaintiff was 5 years old and finishing grade "P4," his report card showed that he was progressing satisfactorily in the following:

Social/group/work activities

Group participation
Initiative
Attention to detail
Completing a work cycle
Choosing appropriate work

Relating well with others
Responding to others' needs and feelings
Expressing his own needs and feelings well

<u>Language</u>

Vocabulary
Phonetics
Word Building
Spelling

<u>Mathematics</u>

Quantity recognition
Symbol recognition
Linear counting
Decimal system

<u>Sensorial</u>

Visual discrimination
Sound discrimination
Touch discrimination
Terminology
Geometric shape/form

<u>Practical life</u>

Sense of order
Sequence
Large motor control
Care of environment
Attention to detail (care of self)

<u>Art</u>

Uses art skills to develop appropriate manipulative skills, fine & gross motor skills

<u>Computers</u>

Can open a document
Knows what the AUP stands for and its importance
Can explain how to stay safe online and off
Can use the tools in the toolbox to enhance graphic
Can format text by changing font, size, color and character style

7

Can explain how technology is used in daily life
Can draw/use graphics that match what the author describes

Music

Sings/plays online and with others within varied styles and musical forms
Moves to, describes, analyzes or discusses music
Described functions of music and musicians in varied settings/cultures

Physical education

Demonstrates cooperation with partners and small groups to accomplish
        objective
Participates in instructionally-appropriate moderate to vigorous physical activity
        for at least 50% of a structured physical education class
Demonstrates the ability to share, be cooperative and safe with others

His report card reflected that he needed improvement in the following areas:

Social/Group/Work Skills

Attentive to groups
Works independently
Handles materials with care
Respects others' work
Concentration
Controls own behavior
Responds to requests from adults
Politeness/courtesy

Language

Reading
Comprehension
Cursive writing

Mathematics

Addition (operations and memorization)

Practical life

Classroom etiquette
Fine motor control
Self reliance

8

Art

Know the nature of human involvement in art as viewers, creators and
    participants
Discusses own art work and art work of others, compare and contrast visual and
    tactile qualities to works of art
Makes statements about the function of particular works of art in the cultures
    which produced them

Plaintiff's alleged onset date is June 1, 2013. He was 5 years of age, and he

was set to begin kindergarten a few months later.

On August 15, 2013, at the very beginning of kindergarten, plaintiff's teacher,

Ms. Bryant, completed a "Teacher Short Form" (Tr. at 123-124, 195-196). Plaintiff was

5 years of age, and Ms. Bryant had known him for the past 2 1/2 years. The

assessment in this form covers the period during the one month preceding her

signature, or from July 15, 2013, through August 15, 2013.

Ms. Bryant reported that the following descriptions are "just a little true" with

respect to plaintiff:

He makes mistakes.

He cannot do things right.

He has poor social skills.

He cannot grasp arithmetic.

He tries to get even with people.

He does not understand what he reads.

He is hard to motivate even with highly desirable rewards.

He is good at planning ahead.

He behaves like an angel.

He is difficult to please or amuse.

Ms. Bryant cannot figure out what makes him happy.

9

Mrs. Bryant reported that the following descriptions are "pretty much true" with respect to plaintiff:

He is constantly moving.

He bullies, threatens or scares others.

He is angry and resentful.

He is excitable and impulsive.

He actively refuses to do what adults tell him to do.

He has trouble getting started on tasks or projects.

He does not pay attention to details or makes careless mistakes.

His spelling is poor.

He leaves his seat when he should stay seated.

He forgets things already learned.

Ms. Bryant reported that the following descriptions are "very much true" with respect to plaintiff:

He has to struggle to complete hard tasks.

He is inattentive, easily distracted.

He is fun to be around.

He has trouble keeping his mind on work or play for long.

He acts in sneaky or manipulative ways.

He tells the truth; does not even tell "little white lies."

He is restless or overactive.

He fidgets or squirms in his seat.

He talks out of turn.

He has a short attention span.

He is sidetracked easily.

Finally, Ms. Bryant indicated that the following factors are "not true at all" with respect to plaintiff:

> He appears to be unaccepted by groups.
> He is patient and content, even when waiting in a long line.
> He is one of the last to be picked for teams or games.
> He has trouble keeping friends.
> He is perfect in every way.
> He does not know how to make friends.

Ms. Bryant stated that plaintiff's problems seriously affect his schoolwork or grades, but his problems do not affect his friendships and relationships at all. She said she was not sure he could keep up academically. She described him as a "good, caring helper."

In an undated[1] Teacher Questionnaire, Ms. Bryant reported the following with respect to the relevant domains (Tr. at 148-155).

Acquiring and Using Information

> Plaintiff has an obvious problem with:
>
>> Understanding school and content vocabulary
>> Learning new material
>
> Plaintiff has a serious problem with:
>
>> Comprehending and/or following oral instructions
>> Comprehending and doing math problems
>> Understanding and participating in class discussions
>> Recalling and applying previously learned material
>> Applying problem-solving skills in class discussions

------

[1]Even though Mrs. Bryant left the date blank, she indicated that she had known plaintiff for 2 1/2 years -- the same length of time as that listed in the form she completed on August 15, 2013.

11

Plaintiff has a very serious problem with:

Reading and comprehending written material
Providing organized oral explanations and adequate descriptions
Expressing ideas in written form

## Attending and Completing Tasks

Plaintiff has a slight problem with:

Sustaining attention during play/sports activities
Organizing his own things or school materials

Plaintiff has a serious problem with:

Focusing long enough to finish assigned activity or task
Refocusing to task when necessary
Carrying out single-step instructions
Completing class/homework assignments
Working at a reasonable pace/finishing on time

Plaintiff has a very serious problem with:

Paying attention when spoken to directly
Carrying out multi-step instructions
Waiting to take turns
Completing work accurately without careless mistakes
Working without distracting self or others

## Interacting and Relating with Others

Plaintiff has a slight problem with:

Making and keeping friends
Relating experiences and telling stories
Introducing and maintaining relevant and appropriate topics of
conversation
Using adequate vocabulary and grammar to express thoughts/ideas in
general, everyday conversation

Plaintiff has an obvious problem with:

Asking permission appropriately
Using language appropriate to the situation and listener
Taking turns in a conversation

Plaintiff has a serious problem with:

      Playing cooperatively with other children
      Seeking attention appropriately
      Interpreting the meaning of facial expressions, body language, hints,
          sarcasm

Plaintiff has a very serious problem with:

      Expressing anger appropriately
      Following rules (classroom, games, sports)
      Respecting/obeying adults in authority

## Moving About and Manipulating Objects

Plaintiff has a slight problem with:

      Demonstrating strength, coordination, dexterity in activities or tasks
      Showing a sense of body's location and movement in space
      Planning remembering, executing controlled motor movements

Plaintiff has an obvious problem with:

      Integrating sensory input with motor output

Plaintiff has a serious problem with:

      Moving and manipulating things (e.g., pushing, pulling, lifting, carrying,
          transferring objects; coordinating eyes and hands to manipulate
          small objects)
      Managing pace of physical activities or tasks

Plaintiff has a very serious problem with:

      Moving body from one place to another (e.g., standing, balancing, shifting
          weight, bending, kneeling, crouching, walking, running, jumping,
          climbing)

## Caring for Himself

Plaintiff has no problem with:

      Taking care of personal hygiene
      Caring for physical needs (e.g., dressing, eating)
      Cooperating in, or being responsible for, taking needed medications

Plaintiff has a slight problem with:

> Using good judgment regarding personal safety and dangerous
> circumstances
> Knowing when to ask for help

Plaintiff has an obvious problem with:

> Identifying and appropriately asserting emotional needs

Plaintiff has a serious problem with:

> Handling frustration appropriately
> Responding appropriately to changes in own mood (e.g., calming self)
> Using appropriate coping skills to meet daily demands of school
> environment

Plaintiff has a very serious problem with:

> Being patient when necessary

Ms. Bryant noted that plaintiff takes medication on a regular basis,[2] he does not frequently miss school due to illness, and she does not know whether plaintiff's functioning changes after taking medication (Tr. at 154).

In another undated form, Request for Administrative Information, Ms. Bryant noted that plaintiff had not been recently evaluated or tested, he had not been referred for assessment team evaluation or special class placement or services, he had not repeated any grades, and he was in regular education with no special instruction (Tr. at 156-157).

---

[2]According to his medical records, plaintiff had first started taking medication three weeks earlier.

On August 26, 2013, Ms. Bryant wrote a note to plaintiff's mother (Tr. at 197).

Today was a very disruptive day. He constantly bothered others work [sic]. Did no lessons. Scribbled all over students' art papers. Concerned about him. Want to keep him on kindergarten.[3]

More than a year later, in a report card dated October 10, 2014, during first grade, plaintiff's teachers made the following comments:

Academic foundation: gaining self-confidence, lacks interest in work
Language arts: poor study habits, does not participate in class
Art: good attitude
Computers: has shown steady improvement
Music: enjoys learning
Physical education: good class participation

(Tr. at 192-193).

He was noted to "need help" in 30 areas, he was noted to "need more practice" in 10 areas. He was noted to be able to "do this all by myself" in 7 areas: demonstrates cooperation; knows the nature of human involvement in arts; uses art skills to develop appropriate manipulative skills; identifies parts of a computer; opens a document on a computer; analyzes music; and demonstrates an awareness of personal space, general space and boundaries while moving in different directions.

### 3.     *Medical Records*

On May 22, 2013, prior to plaintiff's alleged onset date, he saw Dinah Clayton at Swope Health Services (Tr. at 218). Plaintiff's mother indicated that she had been referred to the Swope Health Services Behavioral Health Clinic for a psychiatric

---

[3]It appears that part of this form was cut off during copying.

evaluation for plaintiff and possible medication management. Plaintiff had never been diagnosed with a mental health condition.

On June 12, 2013, a few days after plaintiff's alleged onset date, he was seen by Suzanne Tanner at Swope Health Services (Tr. at 215-217). "Mother reports [he] has issues at school, he got into a disagreement with another student at school, hit him and then told the student I'm going to 'fuck you up'. [He] doesn't listen to me at home I have to tell him things a thousand times. At school he's disruptive in the classroom, he talks back to the teachers, he's easily distracted, uses profane language, will not sit still at home or in class, he doesn't focus. I get calls from his teacher constantly. He's been suspended twice this school year once for saying 'he was going to bring a gun to school.'" Ms. Tanner observed that plaintiff's affect was extremely hyper. He had to be redirected numerous times to sit still. She recommended that plaintiff be evaluated by Latha Venkatesh, M.D., at Swope Health and that plaintiff's mother apply for Medicaid based on plaintiff's mental health diagnosis.

On June 20, 2013, plaintiff was seen at Swope Health Services by Latha Venkatesh, M.D., for intake (Tr. at 213). Plaintiff's mother reported that he hits and curses, he is disruptive in class and talks back, he has difficulty focusing and has been suspended for threatening to bring a gun to school. At home he has difficulty following directions and completing tasks. Dr. Venkatesh recommended a medication evaluation and physical exam be scheduled.

On July 24, 2013, plaintiff saw Latha Venkatesh, M.D., for a medical evaluation (Tr. at 209-211). He was reportedly hyperactive with defiance and anger problems, he had just started kindergarten but was reportedly in trouble at school with frequent

16

suspensions during preschool.  Plaintiff's mother reported a history of mood swings, aggression with property destruction, irritability, lying, problems sitting still, problems paying attention, and problems listening.  He was not on any medication.  The mental status exam results are listed as follows:  "Fairly well groomed, hyperactive and needs constant redirection and very disruptive and easily distracted and he would smile at every concern mom would voice.  Mood is happy and affect is smiling and no evidence of imminent danger to self or others.  No evidence of thought disorder.  Oriented times two and memory for recent is good but immediate recall is poor because of distractibility and 5 minute recall is also poor.  Intelligence is average and insight and judgment is poor."  Dr. Venkatesh assessed ADHD and prescribed Tenex and behavior therapy.

On August 20, 2013, plaintiff saw Tracy Turner, a social worker, for therapy from 3:30 p.m. to 4:30 p.m. (Tr. at 206).  This was plaintiff's first visit.  Plaintiff's mother reported that he is hyperactive and has a difficult time staying on task.  Ms. Turner worked on building a rapport.  Once this appointment was over, plaintiff saw Latha Venkatesh, M.D. (Tr. at 203-204, 208).  Plaintiff said he was tired and did not want to talk.  His mother said he was tired and very hungry and so he was irritable.  Plaintiff's appointment time was 4:30 p.m.  Problems at school were denied, he was reportedly doing very well in school.  His sleep was good, appetite was good.  Mood was up and down, "started his medicine just yesterday."  His mental status exam was normal except affect was irritable.  He was experiencing no symptoms of anxiety.  Dr. Venkatesh assessed ADHD and recommended plaintiff continue his Tenex but increase it after ten days.  "Addressed his irritability and since mom said that he was complaining of being

hungry, recommended giving an evening snack.  Could add 1/2 tab of Tenex if he is having problem in the afternoon after 10 days and mom agreed to do that."

On September 16, 2013, plaintiff was seen at Swope Health Services by case worker Louis Goins to assess plaintiff's current level of functioning and work on care plan goals (Tr. at 201-202).  Plaintiff's problem was "productivity," and his goal was, "I want to get better at doing my work.  I will not talk back or argue with my mom or school officials 3 out of 5 times a day."  Plaintiff comprehended the discussion about not touching other people's property "but due to his age of 5 may have difficulty at times communicating his feelings and responses."  A reward system was developed, and plaintiff was taken to McDonald's for an ice cream.

On September 24, 2013, plaintiff saw Latha Venkatesh, M.D. (Tr. at 200).  Dr. Venkatesh was told that plaintiff's teachers had indicated problems with hyperactivity and concentration.  Dr. Venkatesh continued plaintiff's Tenex and added Ritalin.

On September 30, 2013, case worker Louis Goins spent an hour in plaintiff's home (Tr. at 263-265).  Plaintiff alternated between not wanting to be around anyone to tearfully refusing to leave the proximity of his mother and Mr. Goins.  "[Plaintiff] had to be escorted approximately 4 times back to the residence after walking off and not responding to those addressing him.  [Plaintiff] appeared angry, would not speak, and was very slow to move.  [Mr. Goins] observed that near the end of the session, [plaintiff] repeatedly attempted to get close or to be held by his mother who was folding clothes and packing boxes.  [Plaintiff] continued to exhibit these behaviors and on several occasions shed tears.  [Plaintiff] also entered into and sat in [Mr. Goins's] vehicle without permission and remained there crying and stating that he wanted to go with [Mr.

18

Goins.]" Mr. Goins engaged in role playing to help plaintiff with appropriate responses and listening skills. He indicated he would "maintain weekly contact with [plaintiff] and his mother to ensure medication compliance."

On October 30, 2013, case worker Lois Goins met with plaintiff's teacher and also met with plaintiff one-on-one to talk about academic concerns (Tr. at 260-261). Mr. Goins accompanied plaintiff to lunch and to his classroom. Plaintiff was observed to have a good demeanor throughout the entire session. He was attentive and responded quickly to the directives of Mr. Goins and the teacher. Plaintiff's teacher, Ms. Bryant, expressed concern because she had sent a lot of homework home and had not received any back. She was concerned about plaintiff's inability to read or write. She said she had talked to plaintiff's mother about how the work that was sent home could help plaintiff academically. Ms. Bryant stated that plaintiff's overall behavior had been pretty good. Mr. Goins observed that plaintiff was attentive but not able to totally grasp the significance of completing the extra homework that his teacher sends home. He observed that "when directed, [plaintiff] was again quickly and appropriately responsive." Mr. Goins indicated he would contact plaintiff's mother and encourage her to implement a homework routine for plaintiff in the home.

On November 27, 2013, case worker Louis Goins met with plaintiff in his home for approximately two hours (Tr. at 257-259). They worked on role playing to increase positive interaction with peers and adults and to work on active listening skills. Mr. Goins took plaintiff to the barber shop. He took him to the Community Center and engaged him in physical activities. He encouraged him to play appropriately with other children at the Community Center. Mr. Goins reported that plaintiff had a positive

19

demeanor throughout the entire session. He interacted with his siblings appropriately, he interacted with an acquaintance at the barber shop appropriately, and he interacted with children at the Community Center appropriately. He needed little redirection efforts this day.

On December 17, 2013, plaintiff saw Latha Venkatesh, M.D., at 3:22 p.m. (Tr. at 254-255). Plaintiff would not talk. The case worker who brought plaintiff to this appointment indicated that plaintiff had been having problems with his grades the past couple of weeks. At school he was reportedly impulsive, hyperactive and disruptive. Although plaintiff was reported to be struggling academically, he did not have an IEP. "Denied mood swings." Plaintiff was observed to be fairly well groomed and not hyperactive. He was calm and complaint. His speech and thoughts were normal. His mood was fine and affect was quiet. Plaintiff's medications were continued without change. "Recommended compliance and if it is a concern, school could give him the AM medication. Recommended giving Tenex regularly."

On January 29, 2014, case worker Louis Goins met with plaintiff to assess his current level of functioning (Tr. at 251-253). Mr. Goins picked plaintiff up from school and talked to his teacher about his behavior over the past two weeks, he took plaintiff to his individual therapy appointment, and he tried to role play with plaintiff on active listening skills. Plaintiff's teacher, Ms. Bryant, reported that plaintiff's behaviors continued to fluctuate between defiance and blank stares. His therapist, Tracy Turner, said that he "shut down" during the session and refused to speak with her. While taking plaintiff back to school, Mr. Goins attempted to engage him and coach him on following

the directives of adults, but plaintiff appeared "highly disinterested." Plaintiff was observed to sit still during the session and no redirective efforts were required.

On February 18, 2014, case worker Debra Lee went to plaintiff's mother's place of employment to introduce herself and build a rapport and review plaintiff's behaviors (Tr. at 249-250). Plaintiff's mother was concerned about the change in case workers since she said it had taken plaintiff some time to become accepting and engaging with the previous case worker. She said she cried when the previous case worker indicated he was leaving. She was concerned about the working hours of Ms. Lee, because she said the previous case worker was able to work later hours. "Mother stated she has seven children and works overtime and her boyfriend helps her with pickups for the boys but she could use some assistance with transportation when the two of them are unavailable." Ms. Lee indicated that she would monitor plaintiff at school and speak with his teachers.

On March 27, 2014, case worker Debra Lee went to plaintiff's school to inquire about his behavior since he was taking new medication (Tr. at 246-248). Plaintiff's teacher said that plaintiff was more focused but "appeared to not 'be himself'. She stated for the last week he appears almost 'lifeless' but is doing a little better with his work but still has his days he is not on task." Plaintiff indicated that he felt happy, not sad or mad. Plaintiff's teacher stated that he had a lot of incomplete assignments over the past few weeks.

On April 14, 2014, plaintiff saw Latha Venkatesh, M.D., for a medication check at 11:15 a.m. (Tr. at 243-245). He was brought by his case worker. Plaintiff said he was doing well, not having problems in school, and that he was paying attention. He said he

was doing well at home. The caseworker stated that according to plaintiff's mother, plaintiff was doing better on the Vyvanse. Dr. Venkatesh made the following observations: "fairly well groomed, not hyperactive, has good eye contact and is pleasant and compliant and speech is RRR [regular rate and rhythm], no evidence of tangentiality or circumstantiality and mood is happy and affect is congruent to mood and no evidence of imminent danger to self or others and no evidence of thought disorder. Oriented to time, place and person and memory for recent and remote is good and intelligence is average and thoughts are concrete and insight and judgment is fair." The doctor continued plaintiff's Vyvanse "since doing well".

On May 13, 2014, plaintiff saw Latha Venkatesh, M.D., for a medication check at 11:45 a.m. (Tr. at 240-242). His great grandmother brought him to this appointment. Plaintiff said he was doing OK. His great grandmother said he was doing OK but "sometimes has a mood." School had reported that he was doing pretty good and he was promoted to the next grade and was not in summer school. Dr. Venkatesh observed that plaintiff was fairly well groomed, not hyperactive. His mood was happy but his affect was sulking and defiant and he did not want to talk much. He was fully oriented with normal memory and intelligence, normal thoughts, judgment and insight. His Vyvanse was continued "since doing better in school as per report."

On June 2, 2014, caseworker Debra Lee went to plaintiff's home to take him to his medication management appointment (Tr. at 237-238). Ms. Lee told the doctor what plaintiff's mother had reported with respect to his behavior at home. The doctor recommended changes in plaintiff's diet since he was losing weight. Ms. Lee noted plaintiff's affect was "very flat and non-engaging" as opposed to the day before when he

was more hyper and talkative.  "Doctor stated this is as a result of the medication and that as the day goes by his medication wears down so this is normal for him to behave in this manner.  Doctor talked about importance of eating protein to help him maintain his weight and also to help with irritability during the evenings."

On June 30, 2014, plaintiff saw Latha Venkatesh, M.D., for a medication check at 6:20 p.m. (Tr. at 234-236).  Plaintiff reported that he was "doing good" but his mother reported he was "doing fair."  She indicated that he would start tearing his shirt and stomping when he was upset.  Dr. Venkatesh performed a mental status exam:  "He was fairly well groomed, fidgety, had good eye contact, was pleasant and compliant, his mood was happy, and he showed no evidence of thought disorder."  He was fully oriented with normal memory and good insight and judgment.  Dr. Venkatesh continued plaintiff on Vyvanse and started Intuniv.

On July 29, 2014, Jamal Davis, a case worker at Swope Health Services, visited plaintiff in his home for one hour (Tr. at 231-232).  Plaintiff was taking no medications at the time, even though Dr. Venkatesh had prescribed medications a month and a half earlier.  The caseworker indicated that he would accompany plaintiff on community outings and practice following directions.  Plaintiff said he did not want to be in an alternative school.  They discussed appropriate behavior in school.  Plaintiff "stated that he was pleased that this upcoming school year would be new and exciting.  He expressed joy that he would be going to a traditional school and would not have to deal with the over structure of the alternative school setting.  He stated that he is certain that he will experience minor behavior issues because 'I am a kid', but feels sure that he should not have any major behavior issues."

On August 13, 2014, plaintiff saw Latha Venkatesh, M.D., at 4:00 p.m. (Tr. at 227-229). Plaintiff said he was doing better and denied getting in trouble at school. He said he is able to concentrate well. Plaintiff was brought in by his grandmother, so the doctor called plaintiff's mother who verified that plaintiff was doing better on his current medications. She said he was sleeping well without medication side effects. "Denied aggression." Plaintiff was fairly well groomed, he was not hyperactive, he had good eye contact, his demeanor was observed to be pleasant and compliant. His mood was happy, his thought content was normal. His recent and remote memory was good, his recall memory was good. Nothing abnormal was noted in the medical record. Plaintiff's medications were continued with no changes.

On September 10, 2014, plaintiff saw Latha Venkatesh, M.D., for  medication management (Tr. at 224-226). His appointment began at 5:47 p.m. Plaintiff reported he was doing OK, but his mother reported that she was having trouble getting plaintiff to respond. She did not know whether the problem was hyperactivity, or defiance or comprehension issues. Dr. Venkatesh conducted a mental status exam: "Fairly well groomed, fidgety and distracted easily and mood is OK and affect is quiet." He was not experiencing symptoms of anxiety. She assessed ADHD and refilled plaintiff's medication. She increased his dosage of Intuniv "because of the disruptive behaviors reported." She also recommended testing for IEP or 504.[4]

---

[4]An IEP (individualized education program) is a blueprint or plan for a child's special education experience at school. A 504 plan is a type of plan that falls under Section 504 of the Rehabilitation Act of 1973 which prohibits discrimination against public school students with disabilities. A 504 plan outlines how a child's specific needs are met with accommodations, modifications and other services. The measures are meant to remove barriers to learning. A 504 plan is less detailed than an IEP.

On November 6, 2014, plaintiff saw Latha Venkatesh, M.D. (Tr. at 267). He was told to discontinue Vyvanse, start Adderal, and continuing taking Intuniv.

On November 13, 2014, Latha Venkatesh, M.D., completed a Childhood Disability Evaluation Form (Tr. at 269-274). She checked the box indicating that his impairment meets a listing; however, she left the listing blank and did not identify any listing. She found that plaintiff's limitation in acquiring and using information was less than marked when taking medication. His limitation in attending and completing tasks is markedly limited because he "is distracted easily." She found that his limitation in interacting and relating with others is markedly limited, but she provided no explanation. He had no limitation in moving about and manipulating objects. His limitation in caring for himself was less than marked. She was unable to assess his limitation in health and physical well being because she had not done a physical exam. The rest of the form is blank, including the section entitled, "explanation of findings."

**B.    SUMMARY OF TESTIMONY**

During the November 19, 2014, hearing, plaintiff's mother testified. At the time of the hearing, plaintiff had just turned 7 (Tr. at 167).

Plaintiff is the youngest of 7 children (Tr. at 54). Plaintiff attends first grade at Holiday Montessori (Tr. at 54).

Plaintiff is taking medication prescribed by a doctor at Swope Health Services (Tr. at 54). When he is not on medication, he has problems focusing (Tr. at 54). One day recently plaintiff did not have his medication because his doctor had "pulled the medicine back" (Tr. at 55). His teacher called because she was having issues with

25

plaintiff bothering other students, not being able to concentrate, and not doing what he was told to do (Tr. at 55). He does better when he is on medication (Tr. at 55).

When plaintiff is told to do something, he will not do it (Tr. at 55). After telling him up to five times, Ms. Deboe will try to redirect him but he stomps, shouts and tries to harm himself by scratching, pulling shoestrings out of shoes, tearing clothes and yelling (Tr. at 55). One time recently plaintiff's case worker tried to take him to a doctor appointment (Tr. at 56). Plaintiff did not want to get out of the car (Tr. at 56). After he was finally out of the car, he screamed and yelled that he did not want to go in (Tr. at 56). He missed that appointment (Tr. at 56). His grandmother came and was not able to calm him down so she took him home with her (Tr. at 56). His behavior continued at his grandmother's, so plaintiff's older sister came to get him and took him home (Tr. at 56).

Plaintiff does not pay attention (Tr. at 56). He constantly fights with his brothers and sisters and instigates arguments even with his nieces and nephews (Tr. at 56-57). Plaintiff interrupts his classmates' learning at school (Tr. at 57). A few months before the administrative hearing, plaintiff indicated he was having nightmares (Tr. at 57). Plaintiff is not involved in social activities other than playing with his brothers, sisters, nieces and nephews (Tr. at 57). Plaintiff's grandmother, who is 65 years of age, takes care of plaintiff after school, and it is taking a toll on her (Tr. at 58). She says plaintiff throws temper tantrums and will not follow directions (Tr. at 58).

## IV.  FINDINGS OF THE ALJ

On December 23, 2014, Administrative Law Judge George Bock found plaintiff not disabled (Tr. at 33-46). Plaintiff was a preschooler the date his application was filed

and was a school-age child on the date of the ALJ's decision (Tr. at 36). Plaintiff has not engaged in substantial gainful activity throughout the pertinent period of this case (Tr. at 36).

Plaintiff has attention deficit hyperactivity disorder, which is a severe impairment (Tr. at 36).

Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (Tr. at 36). Plaintiff's ADHD does not meet or equal the listing level of severity under Listing 112.11 because he does not have marked inattention, marked impulsiveness, and marked hyperactivity along with other appropriate age-group criteria (Tr. at 36).

Plaintiff does not have an impairment or combination of impairments that functionally equals the severity of the listings (Tr. at 36-46). Therefore, plaintiff is not disabled (Tr. at 46).

## V. ANALYSIS

Plaintiff argues that the ALJ erred in assessing the severity of plaintiff's condition based on how the opinion evidence was weighed.

The ALJ's analysis of medical opinion evidence is guided by 20 C.F.R. § 416.927(c), which requires the ALJ to use a six-part analysis. Essentially, the ALJ will assign greater weight to medical sources who have treatment experience with the claimant, but any opinion can be rejected if it is not well supported by signs and symptoms, or if it is inconsistent with the record as a whole. SSR 96-2p; 20 C.F.R § 416.927(c)(2) (if a treating doctor's opinion is well supported and not inconsistent, it will be afforded controlling weight); Halverson v. Astrue, 600 F.3d 922, 929-930 (8th Cir.

Case 4:16-cv-00195-REL   Document 16   Filed 12/14/16   Page 27 of 33

2010).  Under the substantial evidence standard, the ALJ need only clarify whether he discounted a treating physician's findings, and, if so, why.  Grable v. Colvin, 770 F.3d 1196, 1201-1202 (8th Cir. 2014).

On November 13, 2014, almost a year and a half after plaintiff's alleged onset date, plaintiff's treating psychiatrist, Latha Venkatesh, M.D., completed a Childhood Disability Evaluation Form.  She checked the box indicating that plaintiff's ADHD meets a listing; however, she did not identify any listing.  She found that plaintiff's limitation in acquiring and using information was less than marked when taking medication.  She found that his limitation in attending and completing tasks was markedly limited because he "is distracted easily."  She found that his limitation in interacting and relating with others was markedly limited, but she provided no explanation.  He had no limitation in moving about and manipulating objects.  His limitation in caring for himself was less than marked.  She was unable to assess his limitation in health and physical well being because she had not done a physical exam.  The rest of the form is blank, including the section entitled, "explanation of findings."

In order to be found disabled, plaintiff must be "markedly" limited in two domains.  The two domains at issue here based on Dr. Venkatesh's opinion are attending and completing tasks and interacting and relating with others.

The ALJ had this to say about the opinion of Dr. Venkatesh:

The undersigned has given Dr. Venkatesh's opinion little weight because it is inconsistent with her own treatment records showing that the claimant underwent numerous grossly normal examinations.  There is no evidence of record that supports a marked limitation in any domain.

(Tr. at 39).

28

Dr. Venkatesh supported her opinion that plaintiff is markedly limited in attending and completing tasks by writing, "is distracted easily." Below is a chart showing the basis for her belief that plaintiff is easily distracted:

| Observations by Dr. Venkatesh | Reports by relative[5]/case worker/teacher |
|---|---|
| | June 20, 2013 - Mother reported plaintiff has difficulty focusing, difficulty following directions, difficulty completing tasks |
| July 24, 2013 - Plaintiff (on no medication at the time) was hyperactive, needed constant redirection, was very disruptive and easily distracted. Memory poor due to distractibility. | July 24, 2013 - Mother reported hyperactivity with defiance, problems paying attention, problems listening |
| | September 24, 2013 - Mother reported teachers said he had problems with hyperactivity and concentration. |
| December 17, 2013 - Plaintiff was not hyperactive. He was calm and compliant. His speech and thoughts were normal. His mood was fine, affect was quiet. | December 17, 2013 - Caseworker said he/she had been told plaintiff was hyperactive, disruptive, impulsive at school. |
| April 14, 2014 - Plaintiff was not hyperactive, was pleasant and compliant. He had normal speech, eye contact, thought processes, memory, insight and judgment. His mood was happy. Dr. Venkatesh noted he was "doing well." | April 14, 2014 - Plaintiff said he was paying attention and doing well. |
| May 13, 2014 - Plaintiff was not hyperactive. His mood was happy. He had normal memory, thoughts, judgment and insight. | |

---

[5]The ALJ found the substantive allegations of plaintiff's mother to be not fully credible, and plaintiff has not challenged this finding.

Case 4:16-cv-00195-REL   Document 16   Filed 12/14/16   Page 29 of 33

| | |
|---|---|
| June 30, 2014 - Plaintiff was fidgety but pleasant and compliant, his mood was happy. He had normal thought process, memory, insight and judgment. No observation of hyperactivity or distraction. | June 30, 2014 - Mother said plaintiff would start tearing his shirt and stomping when upset and that he was only doing "fair." |
| August 13, 2014 - Plaintiff was not hyperactive, had good eye contact, he was pleasant and compliant. His mood was happy, thought content normal, memory good. | August 13, 2014 - Either plaintiff's mother or grandmother "denied aggression." Plaintiff said he was able to concentrate well and was not getting in trouble at school. |

The only time Dr. Venkatesh observed plaintiff to be hyperactive or distractable was during her first visit with him before he was prescribed any medication. After she put him on medication, Dr. Venkatesh observed nothing but normal behavior through the time she completed the Childhood Disability Evaluation Form almost two years later. Additionally, it was infrequent that anyone reported hyperactivity or distractability to Dr. Venkatesh.

Likewise, her finding that plaintiff is markedly limited in his ability to interact and relate with others is unsupported by her treatment records as outlined above. The ALJ properly gave her opinion in the disability evaluation form little weight.

Plaintiff argues that the ALJ erred in failing to consider the opinion of plaintiff's teacher Ms. Bryant. This argument is without merit. Although the ALJ did not use Ms. Bryant's name in his opinion, he clearly referred to her reports numerous times. He referred to the meeting between plaintiff's community support specialist and his teacher in October 2013; he noted the teacher was concerned about plaintiff's reading and writing deficiencies and had said she contacted plaintiff's mother about the homework plaintiff was failing to complete in the evenings and return to school (Tr. at 38, 39). The

ALJ noted that in January 2014, plaintiff's teacher was frustrated at his lack of responsiveness and said she expected his mother to attend an upcoming conference about this issue (Tr. at 38). The ALJ noted that plaintiff's teacher noticed some improvement in his behavior with medication (Tr. at 38). The ALJ noted plaintiff's steady improvement at school, his learning and class participation, and his advancement to the next grade (Tr. at 41). He noted Ms. Bryant's opinion that plaintiff is a good, caring helper at school (Tr. at 43). He noted that the teacher reported that plaintiff has no problem taking care of his personal hygiene and caring for his personal needs (Tr. at 45). Failing to use her name does not discount the fact that the ALJ considered all of the forms submitted by Ms. Bryant.

Finally, plaintiff argues that the ALJ erred in affording substantial weight to the opinion of a non-treating, non-examining medical consultant. Martin Isenbrg, Ph.D., reviewed plaintiff's records on September 30, 2013, and found that plaintiff had no greater than a less-than-marked restriction in any domain of functioning (Tr. at 39). The ALJ found this opinion consistent with the weight of the evidence. Plaintiff's argument on this issue is based solely on the fact that the ALJ gave more weight to the opinion of Dr. Isenberg than to the opinion of plaintiff's treating psychiatrist, Dr. Venkatesh. This argument is without merit.

The regulations specifically state that the ALJ should consider any non-examining doctors' opinions in making a disability determination. SSR 96-6p. The weight assigned to such opinions often relies on the degree to which the source provides supporting explanations for his opinion. 20 C.F.R. § 404.1527(c)(3) ("because nonexamining sources have no examining or treating relationship with you, the weight

31

we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions").  In fact, in some cases, opinions from state agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. Ponder v. Colvin, 770 F.3d 1190, 1195 (8th Cir. 2014).  In Tindell v. Barnhart, 444 F.3d 1002, 1006 (8th Cir. 2006), the court found an ALJ could give greater weight to the opinion of a non-examining medical expert who testified at the hearing than to the treating social worker and to an examining consulting psychologist.  The ALJ in Tindell had provided specific reasons for the weight given the differing opinions and sufficiently explained the inconsistencies which led him to give greater weight to the medical expert.

Here the ALJ provided his reasons for giving the weight he did to each of the doctors' opinions.  As discussed above, Dr. Venkatesh's opinion in the disability form was not at all supported by her treatment records.  However, the opinion of Dr. Isenberg is consistent with the treatment records of plaintiff's treating psychiatrist as well as the other credible evidence in the record.

Plaintiff's argument that the ALJ erred in finding that plaintiff's impairment does not meet or medically equal Listing 112.11 is based on the evidence found not credible by the ALJ, i.e., the disability opinion of Dr. Venkatesh and reports from plaintiff's mother.  I have considered plaintiff's argument on this issue and find it to be without merit.

## VI. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 13, 2016